REGIONAL SALES AGENCY, INC., a Utah corporation, Plaintiff and Respondent,

v.

Roland W. REICHERT, Defendant and Petitioner.

No. 900029.

Supreme Court of Utah.

March 24, 1992.

Bryce E. Roe, Salt Lake City, for plaintiff and respondent.

Ephraim H. Fankhauser, David D. Peck, Salt Lake City, for defendant and petitioner.

ZIMMERMAN, Justice:

This case is before us on a writ of certiorari to the court of appeals to review a decision in favor of Regional Sales Agency ("RSA") and against Roland W. Reichert. The trial court found that Reichert had breached a noncompetition clause in his employment agreement with RSA. The court awarded RSA approximately $800 in damages and $7,500 in attorney fees. RSA appealed the amount of each award, claiming that it was entitled to more. The court of appeals reversed both awards and remanded to the trial court for determination of the amount of damages and attorney fees. The court of appeals also affirmed the trial court's denial of Reichert's cross-appeal that sought to amend his counterclaim. *Regional Sales Agency, Inc. v. Reichert,* 784 P.2d 1210 (Utah Ct.App. 1989). Reichert then sought certiorari.

Before this court, Reichert argues that the court of appeals' decision was incorrect on all grounds. Additionally, he argues that Utah Court of Appeals Judge Judith M. Billings should not have participated on the panel that decided the case because she is related to members in the law firm with which RSA's attorney was affiliated. Therefore, Reichert argues, the decision should be vacated. After the parties had briefed and argued the merits of the case, we requested supplemental briefing and argument on the disqualification issue. Because we agree that Judge Billings' partic-

ipation on the panel was improper, we vacate the decision of the court of appeals and remand the matter for rehearing before a panel that does not include her.

RSA brought the original claim to enforce a noncompetition clause against Reichert and to recover damages from his alleged breach of an employment contract. At trial, the jury found in RSA's favor, awarding approximately $800 in damages. RSA brought a posttrial motion, seeking judgment notwithstanding the verdict of approximately $42,000 and entry of judgment for attorney fees of $26,740.50, plus costs and expenses of $610.46. RSA's attorney filed an uncontroverted affidavit in support of the attorney fee award. RSA moved in the alternative for a new trial on the amount of damages. The court denied the motions as to the damages but granted RSA $7,500 in attorney fees without stating the basis for the reduction of the amount sought.

RSA appealed, arguing that the damage award was erroneous and that the court erred in not stating its basis for the reduction of attorney fees. Reichert cross-appealed the trial court's denial of an amendment to his counterclaim, seeking unpaid commissions and salary. Judge Billings wrote the opinion for a unanimous court. The court of appeals reversed on both the amount of damages and the amount of attorney fees. It remanded the matter to the trial court for determination of the amount of damages and an explanation for the reduction of the attorney fees, or for entry of the amount of uncontroverted fees. The court of appeals also affirmed the denial of Reichert's motion to amend.

Reichert filed a petition for certiorari on January 23, 1990, seeking review of the court of appeals' decision on all grounds. On April 10, 1990, Reichert filed a supplemental petition for certiorari, arguing that the court of appeals' ruling must be overturned because Judge Billings failed to disqualify herself. We granted certiorari on all issues.

This case comes before us in an unusual procedural posture. Reichert asserts that he became aware of the relationship between Judge Billings and Fabian & Clendenin, which is the law firm of RSA attorney Bryce Roe, only after the court of appeals had heard and decided the case. Thus, we have no record concerning Judge Billings' familial relationship to partners in Fabian & Clendenin, and the court of appeals had no opportunity to address the issue. Although the issue is addressed for the first time on certiorari, we have the benefit of supplemental briefs and facts of which we take judicial notice. We conclude that we have a sufficient basis on which to decide whether Judge Billings' participation was proper as a matter of law.

RSA, represented by Roe, brought the original action against Reichert in 1984. At that time, Roe was a member of the law firm of Roe & Fowler, which later changed its name to Roe, Fowler & Moxley. In January of 1986, Roe joined the firm of Fabian & Clendenin and submitted a notice of change of counsel to the court and to Reichert, stating that Roe, Fowler & Moxley was withdrawing as the firm of record and Fabian & Clendenin would replace it. Roe personally handled the case through trial, during the appeal to the court of appeals, and before this court. Since 1986, Fabian & Clendenin has been the firm of record.

The court of appeals panel hearing the case consisted of Judges Billings, Bench, and Greenwood. We take judicial notice pursuant to Utah Rule of Evidence 201 that Judge Billings is related by marriage to Peter Billings, Sr., and Peter Billings, Jr., who are both partners or shareholders of Fabian & Clendenin. *See* Utah R.Evid. 201. Peter Billings, Sr., is Judge Billings' father-in-law; Peter Billings, Jr., is her brother-in-law.

■ Reichert attacks Judge Billings' participation on the panel on three grounds: First, section 78–7–1 of the Code requires judicial disqualification when the judge has a relationship of consanguinity or affinity within the third degree to a "party" to the action, Utah Code Ann. § 78–7–1(1)(b) (1991); second, canon 3(C)(1)(d) of the Utah Code of Judicial Conduct ("U.C.J.C.") requires disqualification when a judge pre-

sides over a case in which relatives within the third degree of relationship have an "interest" that would be "affected by the outcome," U.C.J.C. canon 3(C)(1)(d) (1990); and third, canon 2 of the U.C.J.C. requires disqualification in circumstances that create an appearance of judicial impropriety, U.C.J.C. canon 2 (1990). Because we agree with Reichert's second ground, that Judge Billings' participation in the case contravened canon 3 of the U.C.J.C., we do not reach the other two bases for disqualification.[1]

Before we turn to the merits of the case, we note that this is the first time we have addressed the question of what constitutes an "interest" in a case that would be "affected by the outcome" within the meaning of canon 3. We also note that there is no indication that either of the Billings family members affiliated with the firm of Fabian & Clendenin participated in this case at any time or that Judge Billings actually knew that Roe was affiliated with Fabian & Clendenin.[2] Reichert neither contends that Judge Billings' failure to disqualify herself

was intentional or malicious nor asserts that Judge Billings would have acted differently had Fabian & Clendenin not been involved. He does, however, argue that under the circumstances of this case, Judge Billings' participation creates an appearance of impropriety.

Canon 3[3] of the U.C.J.C. is based on the American Bar Association Model Code of Judicial Conduct promulgated in 1972. The Model Code has been adopted in whole or in part by Utah and forty-six other states, as well as by the United States Judicial Conference. J. Shaman, S. Lubet & J. Alfini, *Judicial Conduct and Ethics* § 1.02 (1990). Section C of canon 3 begins with the broad proposition that judges must disqualify themselves when their "impartiality might reasonably be questioned." It then provides a list of examples in which application of this proposition requires disqualification. Subpart (iii) of canon 3(C)(1)(d), for instance, requires disqualification when the judge knows that someone within the third degree of relationship[4] to the judge

---

1. The pertinent language of section 78-7-1 provides:

> Except by consent of all parties, no justice, judge, or justice court judge may sit or act in any action or proceeding:
> ...;
> (c) when he [or she] is related to either party by consanguinity or affinity within the third degree, computed according to the rules of the common law....

Utah Code Ann. § 78-7-1(1)(b) (1991). The statute is explicit that without the consent of the parties, a judge must disqualify him- or herself,. regardless of the circumstances, if the judge is related to a *party* within the third degree of affinity. Courts addressing whether an attorney is a "party" under statutes analogous to Utah's have reached differing results. *See* Annotation, *Relationship to Attorney as Disqualifying Judge,* 50 A.L.R.2d 143, 153–58 (1956 & Supp.); *see also SCA Servs., Inc., v. Morgan,* 557 F.2d 110, 114 (7th Cir.1977). We do not address this issue because it is not essential to the determination of this case, nor are we compelled to address the appearance of impropriety claim under canon 2 of the Utah Code of Judicial Conduct ("U.C.J.C.").

2. We note, however, that the briefs and papers filed in the court of appeals clearly show Fabian & Clendenin as the firm of record and Roe as a member of that firm.

3. The pertinent language of canon 3 provides:
> C. Disqualification.

> (1) Disqualification must be entered in a proceeding by any judge whose impartiality might reasonably be questioned, including but not limited to instances where:
> ...;
> (d) The judge or spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
> ...;
> (iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding....

U.C.J.C. canon 3(C)(1)(d).

4. The reporter's notes to the Model Code state that in determining when a person is within the third degree of relationship,

> [t]he essence of the [third degree of relationship] test is to count as one degree each person in the chain from the judge to the common ancestor and from the common ancestor to the person whose relationship raises the issue. For example, if the issue is raised by the judge's relationship with X, a son of the judge's father's brother, the counting of degrees would be as follows:
> > The judge's father is related in the first degree; his father's father, the common ancestor, in the second degree; the father's brother, in the third degree; and the brother's son, X, is related to the judge in the fourth degree.

E. Thode, *Reporter's Notes to Code of Judicial Conduct* 68–69 (1973).

or the judge's spouse "[has] an interest that could be substantially affected by the outcome of the proceeding." U.C.J.C. canon 3(C)(1)(d)(iii). There is no question that both Peter Billings, Sr., and Peter Billings, Jr., are within the third degree of relationship to Judge Billings or her husband.

However, as the commentary to canon 3 of the Model Code of Judicial Conduct implies, it is not always easy to determine when a relative of the requisite degree of relationship has an "interest" that might be sufficiently "affected by the outcome" to warrant disqualification. As the comment states, "The fact that a [lawyer] in a proceeding is affiliated with a law firm with which a lawyer-relative of the judge is affiliated does not of itself disqualify the judge." Model Code of Judicial Conduct canon 3, cmt. (E)(1)(d) (1972). Therefore, the question we must address is whether and under what circumstances a partner or shareholder in a law firm who is within the third degree of relationship to a judge but not acting as a lawyer in the proceeding has such an interest in that proceeding that the judge must disqualify him- or herself.

Although we have had no occasion to interpret the canon at issue, the Ethics Advisory Committee of the Utah State Bar has addressed it in an informal opinion. *See* Utah State Bar Ethics Advisory Comm., Informal Op. 90–3 (1990) [hereinafter Utah Advisory Opinion]. In addition, the ABA Advisory Committee on Judicial Activities and a number of courts in other jurisdictions have discussed judicial disqualification based on rules and statutes derived from the Model Code and similar to canon 3 of the U.C.J.C.[5] We look to these sources for guidance in this case.

■ In determining what constitutes "an interest that could be substantially affected," the Utah and federal ethics advisory committees and the courts have considered several factors. Of primary concern is the financial remuneration the judge's relative might receive. *See* Utah Advisory Opinion; ABA Comm. on Judicial Activities, Formal Op. 58 (1978) [hereinafter ABA Advisory

Opinion 58]; ABA Comm. on Judicial Activities, Formal Op. 77 (1985) [hereinafter ABA Advisory Opinion 77]; *Ransom v. S & S Food Center, Inc.*, 700 F.2d 670, 672 (11th Cir.), *reh'g denied*, 705 F.2d 471 (11th Cir.1983); *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1107 (5th Cir.), *reh'g denied*, 613 F.2d 314 (5th Cir.), *cert. denied*, 449 U.S. 820 (1980); *SCA Servs., Inc. v. Morgan*, 557 F.2d 110, 115 (7th Cir.1977). Closely related to direct financial remuneration are nonpecuniary benefits to the lawyer-relative's firm, such as enhanced reputation and increased goodwill that indirectly benefit the lawyer-relative. *See SCA Servs., Inc.*, 557 F.2d at 115; *Diversifoods, Inc. v. Diversifoods, Inc.*, 595 F.Supp. 133, 138 (N.D.Ill.1984); *Reilly By Reilly v. Southeastern Pa. Transp.*, 330 Pa.Super. 420, 438–39, 479 A.2d 973, 983 (1984). We address financial remuneration first.

Courts uniformly hold that judges must disqualify themselves from presiding over a case if one or more of the lawyers on the case belong to a law firm in which the judge's relative of the requisite degree of relationship is a partner. *Potashnick*, 609 F.2d at 1114; *Ransom*, 700 F.2d at 672; *SCA Servs., Inc.*, 557 F.2d at 115; *Stephens v. Stephens*, 249 Ga. 700, 703, 292 S.E.2d 689, 691 (1982). The Utah Advisory Opinion adopts the same position. This conclusion recognizes that there is an appearance of impropriety in situations where the judge can control, at least to some extent, the amount of money the judge's relative will receive as a result of the distribution of fees within the firm. The appearance of impropriety is most obvious where the fee arrangement is to any degree contingent on the outcome of the case or where the judge is called upon to make an award of attorney fees. In such cases, the nexus between the judge's act and the compensation to the relative is apparent.

Although cases in which the outcome determines the judge's relative's renumeration present the clearest instances of judi-

5. The federal counterpart to the Utah rule is found at 28 U.S.C. § 455(b)(5)(iii) (1991).

cial impropriety, we do not limit our holding to contingent fee arrangements. We recognize that it might be argued that in cases where the fee is fixed without regard to the outcome, such as where billing is on an hourly or piece-rate basis, any nexus between the judge's decision and compensation to the relative is de minimus and a requirement of disqualification is unduly harsh. However, such an argument ignores the reality of law practice. In practice, what appear to be fixed-fee arrangements often depend on the outcome of the case. Firms purporting to bill clients on an hourly basis commonly discount the hours expended on a case if the outcome is unfavorable to the client. Similarly, firms that achieve favorable results for their clients often consider that success in fixing their hourly rates, deciding whether to write off time or expenses, or determining their final fee. If we were to hinge disqualification on a determination of whether the outcome of the case would affect the fees paid to the lawyer-relative's firm, in effect we would require an evidentiary hearing in every purportedly fixed-fee case to determine in advance whether the lawyer-relative's financial interest might be affected by the outcome. Even if the hearing indicated no such impact, that determination might not foreclose an after-the-fact claim that the final distribution of fees did not

conform to the representations made in the original hearing.

 To avoid an expensive and time-consuming inquiry into every fee arrangement, we adopt a bright-line proscription. While we agree that where there is no contingent benefit to the relative, the impartiality of the judge cannot reasonably be questioned, we are loath to create such potential for satellite litigation. With no apparent offsetting gains, a rule requiring disqualification only when the outcome of a case actually affects the judge's relative's remuneration would lead us into the morass of fee arrangements and attorney compensation to determine whether the judge's relative would derive contingent benefits from the outcome. We therefore conclude that under canon 3, a relative of the requisite degree of relationship has an "interest" that might be sufficiently "affected by the outcome" of a case in *every* situation where a judge sits on a case in which the judge's relative is a partner or otherwise an equity participant[6] in a firm that represents a party to the case. This position proscribes judicial conduct that might give rise to any legitimate claim of appearance of impropriety based on benefit to a lawyer-relative, while providing all parties with a clear rule that avoids a detailed examination of the billing and compensation practices of the relative's firm.[7]

6. Under Utah's Professional Corporation Act, Utah Code Ann. §§ 16–11–1 to –15 (1987), partners in law firms are commonly referred to as shareholders. *See* Utah Code Ann. § 16–11–1.

7. In his dissent, Associate Chief Justice Howe raises two objections to the majority opinion. First, he charges that because of the high profile Judge Billings, Peter Billings, Sr., and Peter Billings, Jr., enjoy in the Salt Lake legal community, counsel should have been aware of their relationship before the case progressed to a petition for certiorari. Therefore, he says, counsel failed to object in a timely manner to Judge Billings' participation on the panel. Second, he points to our opinion in *State v. Neeley*, 748 P.2d 1091 (Utah 1988), as support for the proposition that a judge's failure to disqualify him- or herself should not lead to an automatic reversal of his or her decision.

Taking his points in order, we note first that Justice Howe assumes too much knowledge on the part of the average member of the bar. We

should not require counsel to display a detailed grasp of judicial genealogies, especially in today's growing and diverse legal community. Second, Justice Howe's reliance on *Neeley* is unwarranted. In that case, counsel had notice that the trial judge had encountered the defendant before, when, as a district attorney, he had signed the criminal information in four earlier cases involving the defendant and had appeared in court to accept a guilty plea. *Id.* at 1093. Counsel had no such notice of the grounds of disqualification here; therefore, the precedent is inapposite.

On a deeper level, we note that both of Justice Howe's objections foist the burden to disqualify the judge onto counsel. This is incorrect. It was Judge Billings' responsibility to identify her relationship to Fabian & Clendenin and take appropriate measures to recuse herself from participating on the panel. Because she failed to do so, we see no alternative but to reverse the panel's decision. The remedy Justice Howe proposes—that of requiring counsel to establish bias and prejudice before we will set aside the

■ Although this is sufficient to dispose of the case, we recognize that there are circumstances in which a lawyer-relative and the affiliated law firm may receive a sufficient nonpecuniary benefit to create an appearance of impropriety requiring disqualification. Courts addressing this issue generally identify the goodwill the law firm reaps as the implicated nonpecuniary interest. *See Diversifoods, Inc.*, 595 F.Supp. at 138; *Reilly By Reilly*, 330 Pa.Super. at 439, 479 A.2d at 983. The courts do not clearly articulate the rationale for this view. Our reading of the cases, however, convinces us that the courts are concerned with situations where the law firm's reputation is enhanced by the decision of the judge-relative so that, over time, the firm and the lawyer-relative in question will benefit sufficiently to create an appearance of impropriety. Unlike cases where direct remuneration results from the judge's action and an appearance of impropriety is readily discerned, the benefit to the lawyer in cases where goodwill and reputation are enhanced is much more removed. As such, to create a sufficient benefit to the lawyer-relative from enhanced reputation and goodwill to the firm so that disqualification may be appropriate, the case before the judge-relative must be one which will greatly affect the firm's reputation.

Although this case involves relatives who are equity participants, we note the related issues of the nonequity lawyer-relative for the benefit of the bench and bar. Courts, as well as the ethics advisory committees of Utah and the American Bar Association, view an associate's interest differently than that of a partner or shareholder. In such circumstances, the associate's salary is assumed to be fixed without regard to the financial outcome of the firm's cases. Therefore, these authorities reason that a judge's decision in a specific case could have only minimal impact on the amount of money flowing to the associate. On this basis, they conclude that where the lawyer-relative is an associate in a firm representing a party in a proceeding before the judge, the associate's lack of interest in the outcome of the proceeding creates no appearance of impropriety and no need for disqualification.[8] *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 463 (5th Cir.), *reh'g denied,* 561 F.2d 831 (1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 *reh'g denied,* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978); Utah Advisory Opinion; ABA Advisory Opinion 58; ABA Advisory Opinion 77.

■ Because the present case does not involve an associate, we need not decide the question. However, in the interest of candor, we do note that the simple model of an associate's drawing a fixed salary may not fit all law firms. To the degree that a significant proportion of the associate compensation depends on factors analogous to those used in fixing partner or shareholder compensation, similar ethical inquiries may be necessary. Conversely, we also note that the nonpecuniary interests which might create an appearance of impropriety for a partner or shareholder may not have the same effect on the disqualification analysis where a nonequity associate is involved. Because nonpecuniary interests that might enhance a firm's goodwill will result in benefits only over time, an associate's lack of secure tenure with a firm, whether because of the probationary nature of an associate's status or because of significant interfirm movement of young lawyers, reduces the likelihood of long-term benefit such that disqualification is not necessary.

For the reasons noted above, we vacate the court of appeals' decision and remand to the court of appeals for rehearing of the substantive issues.

HALL, C.J., and DURHAM, J., concur.

---

decision—is inadequate to address the plain violation of the conflict of interest rule.

**8.** This position is similar to that adopted in the context of government employee cases where the lawyer-relative works in the office acting on the case. *See, e.g., State v. Logan*, 236 Kan. 79, 85, 689 P.2d 778, 785 (1989); *Smith v. Beckman,* 683 P.2d 1214, 1216 (Colo.Ct.App.1984). In these cases, courts reason that because the employee-relative's salary is fixed, nothing the judge decides can benefit the employee-relative who is not acting as a lawyer in the case.

HOWE, Associate Chief Justice (dissenting):

I dissent on two grounds. First, Reichert has not shown that his objection to the participation of Judge Billings was made timely, and second, assuming Judge Billings should have recused herself under the canons of judicial conduct, her failure to do so should not ipso facto work a setting aside of the decision of the court of appeals.

## I. OBJECTION NOT TIMELY RAISED

As the majority opinion points out, "[T]his case comes before us in an unusual procedural posture." No objection was raised to the participation of Judge Billings when the case was orally argued before a panel which included her in the court of appeals. No objection was raised when an opinion was handed down on November 24, 1989, or in Reichert's petition for a writ of certiorari filed with this court on January 23, 1990. It was not until April 10, 1990, that the objection was first raised by Reichert in a reply brief to Regional Sales Agency's (RSA) brief which had been filed in opposition to the petition for certiorari. Counsel for Reichert in an affidavit dated April 10, 1990, stated:

> On or about April 6, 1990, I became aware for the first time of the fact that Judge Judith Billings ... was possibly related to certain partners at the firm of Fabian & Clendenin, counsel for respondent herein.

> I subsequently initiated a diligent inquiry into the relationship of Judge Billings and Peter Billings, Sr. and Peter Billings, Jr. and discovered that they are Judge Billings' Father-in-Law and Brother-in-Law respectively, and that they are partners at Fabian & Clendenin.

There is no indication in the affidavit as to how counsel became aware of Judge Billings' relationship, but in a brief subsequently filed with this court, he states that he became aware by noticing the names of Peter Billings, Sr., and Peter Billings, Jr., on the Fabian and Clendenin letterhead. No explanation is offered as to when the letterhead came into his possession. Mr. Roe, who was counsel for RSA, gave notice to the court and to Reichert's counsel on January 14, 1986, that he had become associated with the firm of Fabian and Clendenin. Thus, it is entirely possible that the letterhead could have come into the possession of Reichert's counsel at any time after the last mentioned date, which was more than four years prior to the time Reichert's counsel claims to have first become aware of the possibility of the relationship. During that four-year period, discovery was conducted; a trial was held; an appeal was taken to the court of appeals with oral argument before the panel; a written decision was rendered by that court; and a petition for a writ of certiorari was filed with this court.

Utah Rule of Civil Procedure 63(b) requires that an affidavit which seeks to disqualify a judge "shall be filed as soon as practicable after the case has been assigned or such bias or prejudice is known." In our recent case of *Madsen v. Prudential Federal Savings and Loan*, 767 P.2d 538 (Utah 1988), we emphasized the requirement of timeliness and held that a motion to disqualify a judge which was filed thirty-nine days after the trial came too late. There, we wrote:

> While a motion to disqualify a judge should not be undertaken lightly, it must be made promptly. A party who has a reasonable basis for moving to disqualify a judge may not delay in the hope of first obtaining a favorable ruling and then complain only if the result is unfavorable. Not only is such a tactic unfair, but it may evidence a belief that the judge is not in fact biased. Furthermore, delay imposes unnecessary disruption on both the judicial system and litigants. A disqualification proceeding is a collateral attack on the substantive action, it disrupts orderly litigation, and it necessarily results in significant additional costs to the parties. Accordingly, a party must move with dispatch once a basis for disqualification is discovered.

*Id.* at 542 (citations omitted).

We cited and briefly stated the rulings of numerous federal and state cases which

were decided on the basis of whether the objection had been timely made. *See also* Richard C. Tinney, Annotation, *Waiver or Loss of Right to Disqualify Judge by Participation in Proceedings—Modern State Civil Cases*, 24 A.L.R.4th 870 (1983); Annotation, *Timeliness of Affidavit of Disqualification of Trial Judge Under 28 USCS § 144*, 24 A.L.R.Fed. 290 (1975). Modern cases recognize the general rule that constitutional, statutory, or court-rule provisions disqualifying judges in particular circumstances render actions by a disqualified judge voidable only, and not void. Accordingly, a judge's disqualification may be waived by the parties. Annotation, 24 A.L.R.4th at 877.

In determining whether an affidavit of prejudice has been timely filed, courts often look at whether the affiant exercised diligence in discovering the facts upon which his affidavit is based. For example, in *United States v. Hoffa*, 245 F.Supp. 772 (E.D.Tenn.1965), an affidavit of prejudice against a trial judge was filed eighteen months after trial and within a few days after the defendant's conviction had been affirmed upon appeal. In holding the affidavit to be untimely, the court wrote:

> In this case there is a total lack of showing of any facts upon which diligence might be inferred. The same diligence which produced the affidavit within a few days after affirmance of defendants' convictions upon appeal could doubtless have produced it at any prior time.

*Id.* at 776.

In the instant case, no explanation is offered as to why Reichert's counsel was not earlier alerted by the Fabian and Clendenin letterhead or from other sources of the possible relationship between Judge Billings and the two members of her husband's family who are shareholders in that firm. At this stage of the proceedings and in light of the void in the record, I cannot say that Reichert's counsel has demonstrated the diligence which is required to show that his affidavit of prejudice was timely filed. Coupled with this void in the record is the fact that Judge Billings had been a judge on the court of appeals for almost three years when that court rendered its decision and immediately prior to becoming a judge of that court had served five years as a district court judge in Salt Lake County where counsel for both parties are officed and practice. Peter Billings, Sr., a senior member of the firm of Fabian and Clendenin, has been associated with that firm for over forty years. Peter Billings, Jr., has been associated with that firm for a shorter but significant period of time. During that forty-year period, Fabian and Clendenin has been officed in downtown Salt Lake City and has had high visibility in the legal community. Reichert's counsel is also a well-known, longtime practitioner and has officed in downtown Salt Lake City for many years. In view of all these facts and based on the record before us, I cannot join in setting aside the opinion of the court of appeals without an explanation of why Reichert's counsel did not discover sooner the link between Judge Billings and her relatives in the firm representing RSA.

## II. CANONS DO NOT HAVE FORCE OF LAW

Assuming that the objection to Judge Billings' participation was timely raised, I cannot join the majority in holding that ipso facto the decision of the court of appeals must be set aside. In the first place, I believe that Judge Billings, as with any other judicial officer, should be entitled to be heard before any determination is made that she violated a canon of judicial ethics. Second, assuming that there was a violation, the appropriate remedy is not automatically setting aside a decision in which she participated with two other judges. Reichert relies on *Smith v. Beckman*, 683 P.2d 1214 (Colo.Ct.App.1984), where the court held that in determining whether a motion raised grounds for disqualification, a judge must consider not only the specific provisions of the statutes and rules of procedure cited, but also the code of judicial conduct, citing *Stephens v. Stephens*, 249 Ga. 700, 292 S.E.2d 689 (1982). I do not disagree with that holding. However, that is not the question before us. I would hold as did the federal district judge in *United*

*States v. Conforte*, 457 F.Supp. 641 (D.Nev.1978), *aff'd*, 624 F.2d 869 (9th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980), that an otherwise proper judicial decision should not be automatically set aside because the judge making the decision violated a canon of judicial conduct. Said the court:

> The only decisions cited by the defendants in support of their assertion are cases in which judges relied on the canons as a basis on which to disqualify themselves before a trial had begun. There do not appear to be any cases reversing a lower court's failure to recuse based on the canons. This is understandable because, as a practical matter, the disqualification provisions of the Code of Conduct can only be construed as establishing a standard for judicial behavior rather than imposing a mandatory duty enforceable after the fact by the reversal of otherwise proper judicial decisions.

457 F.Supp. at 656 (citations omitted).

The majority in the case at bar does not cite a single case where a decision of a trial or appellate court was set aside because of a violation of a canon. Just as the judge in *Conforte* could not find any case so holding, my research has yielded none. In *Hoff v. Eighth Judicial District Court*, 79 Nev. 108, 378 P.2d 977 (1963), the arraignment of a criminal defendant was set aside because it had been presided over by a district court judge who was the father of the district attorney. An applicable *statute* provided that a judge should not act when he is related to an attorney for either party. The court regarded the terms of the statute as mandatory and held that the defendant had timely objected to the participation of the judge. In the instant case, the majority does not rely on our statute on disqualification, Utah Code Ann. § 78–7–1, which only prohibits a judge from acting in a case in which he or she is related to a party, but not to an attorney for a party. Nor does the majority rely on rule ·63(b), Utah Rules of Civil Procedure, which requires disqualification only when a legally sufficient affidavit of bias or prejudice has been filed against a judge. Instead, the majority sweeps aside the statute and the rule and elevates a much more restrictive canon of conduct to the status of paramount law and without any additional showing overturns an appellate decision. I would not accord, and no case has accorded, this force to a canon.

While this court has not heretofore decided the precise question before us, *viz.*, whether violation of a canon of judicial conduct by a judge in a civil case on appeal should work an automatic setting aside of the panel's decision, we did address a similar question in *State v. Neeley*, 748 P.2d 1091 (Utah 1988). In that case, the defendants filed an affidavit in support of their motion to disqualify the trial judge because he had served as district attorney before coming on the bench. In that capacity, some twenty years earlier, he had signed the criminal information in four cases involving defendant Belt, and in one of the cases, he appeared in court when Belt entered a guilty plea. The affidavit was determined to be legally insufficient by two other judges in the trial court, and the trial went forward before the challenged judge. The defendants were convicted, and upon appeal to this court, they contended that the trial judge's failure to disqualify himself was reversible error because he had violated a canon of judicial conduct. We affirmed the convictions and refused to grant a new trial, stating:

> This standard set forth by the Code of Judicial Conduct should be given careful consideration by the trial judge. It may require recusal in instances where no actual bias is shown. Failure to observe it may subject the judge to disciplinary measures. However, that does not necessarily mean that the defendant is entitled to a new trial. The parameters of defendants' constitutional rights to a fair trial are defined in section 77–35–29(c)–(d) and relevant case law, *not* the Code of Judicial Conduct. *See Harvell v. State*, 742 P.2d 1138, 1140 (Okla.Crim.App.1987); *State v. Wixon*, 30 Wash.App. 63, 69, 631 P.2d 1033, 1038 (1981).

748 P.2d at 1094 (emphasis in original).

At this stage of the proceeding, I believe that something more should be shown to

establish bias and prejudice before we set aside the decision of the court of appeals. Complaints that a judge has violated the canons of judicial conduct should be addressed to the Judicial Conduct Commission. Utah Code Ann. § 78-7-27 to -30. Provision is there made for the censure or reprimand of violating judges. We should not grant a windfall of additional relief by automatically setting aside what may be an otherwise proper decision.

In conclusion, I would not set aside the decision of the court of appeals but would address the merits of the substantive matters raised by Reichert on this certiorari review.

STEWART, J., concurs in the dissenting opinion of HOWE, Associate C.J.